No. 31,339

MINNEAPOLIS-MOLINE POWER IMPLEMENT COMPANY, *Appellant,* v.
EMERY E. BECK, *Appellee.*

(30 P. 2d 1085.)

Opinion filed April 7, 1934.

*Albert Watkins, Arthur C. Scates,* both of Dodge City, and *Charles V. Garnett,* of Kansas City, Mo., for the appellant; *I. N. Watson, H. N. Ess, P. C. Groner, P. V. Barnett* and *C. E. Whittaker,* all of Kansas City, Mo., of counsel.

*Carl Van Riper,* of Dodge City, for the appellee.

The opinion of the court was delivered by

DAWSON, J.: This was an action by plaintiff for a sum of money due on two promissory notes executed by defendant, and a cross action by defendant for a larger sum of money alleged to be due him as commission on the sale of plaintiff's farm implements.

Plaintiff's claim against defendant was established without much dispute, and judgment was awarded in its behalf. The serious issue related to matters involved in the cross claims of defendant, the least controversial aspects of which may be stated thus:

In 1927 defendant, as agent, handled and sold plaintiff's machinery in Dodge City and vicinity. In 1928 plaintiff appointed C. W. Gray and A. W. Moltz as general distributors of its implements at Dodge City. Gray was authorized to enter into subdealer's contracts, and by some sort of oral arrangement between Gray and defendant the latter did effect a few sales of plaintiff's implements during the season of 1928. Such written subdealer's contract to govern the rights and obligations of plaintiff and defendant was prepared and signed by defendant. By its terms it recited:

"This agreement is not binding unless approved at West Minneapolis, Hopkins, P. O., Minnesota, by an officer of the company."

This contract was forwarded to plaintiff's headquarters for approval, but such was never given—at least defendant was never notified of its approval, although at the trial of this action the contract was offered in evidence bearing an indorsement on the back of the instrument reciting that it had been approved.

In his cross petition defendant Beck alleged that he had made an oral contract with plaintiff's agent Gray, whereby he, Beck, was to be plaintiff's local-agent for the sale of plaintiff's implements and that he was to receive a commission of twenty per cent on all sales of plaintiff's machinery in and about Dodge City. His cross petition set out in detail certain alleged sales effected by him, the commissions of which, according to his alleged oral contract with Gray, aggregated $3,964. Defendant prayed judgment for this amount, less whatever the court should find due from him on account of his notes held by plaintiff.

The trial court gave judgment for plaintiff for the amount of the notes, $905.10; it also made findings of fact and conclusions of law, some of which read:

"1. The court finds that about the 1st of March, 1929, (1928) the plaintiff, acting by its agent C. W. Gray, entered into an oral contract with the defendant constituting the defendant the local dealer for the plaintiff company at Dodge City, Kansas, and agreeing to pay the defendant a commission of twenty per cent on all local or retail sales of machinery made at Dodge City, Kansas.

"2. The court finds that the defendant began working for the plaintiff about the 1st of March, 1928, under the oral contract made at that time and was working under said oral contract at the time C. W. Gray, as the agent of the company, procured the defendant's signature to two copies of a proposed written contract, . . .

"3. The court finds that the defendant continued working . . . after said proposed written contract had been delivered to said C. W. Gray to be sent to the plaintiff company for its approval . . .

"4. The court finds that the plaintiff company did not in any way or manner report to or communicate with the defendant as to whether said contract had been approved or accepted by it or not, and said C. W. Gray never reported to the defendant at any time whether said contract had been approved or accepted by the plaintiff company or not.

"As a conclusion of law the court finds that *the proposed written contract*, referred to in the foregoing findings of fact, *became a contract between plaintiff and defendant and the defendant's rights and claims to commissions are governed by the terms of said written contract*." (Italics ours.)

The trial court's findings also set out in detail certain items of commissions to which it found defendant entitled, and gave judgment thereon in favor of defendant in the sum of $206.17 *in excess* of the amount found due from defendant to plaintiff.

Plaintiff appeals, directing attention to the terms of the subdealer's written contract (which the trial court held to govern defendant's rights and claims to commissions), and contends that by its terms defendant was entitled to none of the commissions allowed by the trial court. To a proper understanding of this contention we must summarize the principal contents of the contract:

Beck, as subdealer, agreed to take written orders for plaintiff's machinery upon conditions, terms, and prices prescribed in duplicate form prepared by plaintiff for that purpose. These orders were to be signed by the purchaser and recommended by Beck, one copy of which was to be delivered to the purchaser and the other forwarded to plaintiff. The orders were also to contain true statements of the real and personal property of the purchaser, showing that he owned a farm or other real estate worth at least the amount of credit asked, above all encumbrances and exemptions, and that there were no judgments against the purchaser, and that he had sufficient other personal property unencumbered to enable him to carry on his farm business.

Beck also agreed to take notes, mortgages, receipts and settlements for all machinery sold, on blanks furnished by the company, and agreed that the security taken should be immediately filed for record, and all such notes, mortgages, securities, property and settlements taken on sales were to be promptly remitted to plaintiff at its home office in Minneapolis, Minn.

Beck also agreed that no machinery, goods and supplies were to be delivered until he had been notified in writing of the acceptance of the order by the company and until the same were fully settled for as prescribed in the order.

Beck also agreed to receive and pay freight and advance charges on machinery and supplies ordered and furnished, and to store, care for and insure the same for the benefit of the company, without expense to the company, and to pay taxes thereon.

Beck also bound himself to attend to the delivery and setting up of all machines and to see that they worked well, and to remedy at his own expense all complaints, and when necessity required

him to call on the company for help he agreed to furnish an assistant at his own expense while engaged in adjusting machines.

For these and incidental services and to reimburse him for expenses of canvassing, taking and preparing securities, setting up, exhibiting, storing and adjusting machines, advertising, taxes, and insurance, plaintiff agreed to pay Beck special commissions—twenty per cent for all goods except pneumatic stackers, which were fixed at ten per cent. Certain discounts were also to be allowed for cash on notes collected on or before specified dates.

Other terms of the contract provided that the title to all machinery shipped to the dealer or held by him, and title to proceeds of the same when sold, whether in cash, notes or other property, should be and remain in the plaintiff. Commissions on time sales should be payable only on the annual installments paid thereon. On each time sale a nonnegotiable commission certificate was to be issued to Beck, payable when and after payment was received by plaintiff on the installment notes in accordance with which these certificates had been issued. One provision reads:

"That the payment to and receipt by the company at its home office of its net price in cash, of the machinery and extras shall be the essence of this agreement."

It was further agreed that no commission was to be allowed or paid on orders not settled for in accordance with this contract; nor on orders not filled; nor on machinery or extras returned; nor on goods taken back by bill of sale or bid in by plaintiff in foreclosure sale—in all of which cases certificates for Beck's commissions were to become void and surrendered to the company. Another provision of the contract reads:

"5th. That no commission shall be allowed or paid upon: the resale of goods taken back under a bill of sale or agreement, or bid in by the company upon execution or foreclosure sales; the sale of second-hand goods of any kind; goods sold under special agreement to replace goods burned; goods sold or exchanged for other goods on account of alleged defects; sales made where other machinery or property is taken as part payment or in trade; unless as to each such sale, a specific agreement shall be made in writing, approved by the company at its home office, and when so approved all the terms and provisions of this agreement shall apply."

It was shown that Beck effected sales of farm machinery to three persons, Brent, Adrian and Friesen, and that he was paid a commission therefor; but the trial court found that he was entitled to an additional commission of $68 on the sale to Brent, $35 of which was

due at the time of the trial, and $33 of which would be due whenever Brent should pay the balance of his obligation to the plaintiff. On the Adrian sale the court allowed Beck an additional commission of $92, and $32 additional on the sale to Friesen. In each of these sales Beck executed a separate written agreement respecting the commission he was to receive. By its terms Beck agreed to accept as his commission in the sale of a combine to Brent the sum of $244. Beck testified that he signed that agreement in blank and relied on Gray's stenographer to fill in the amount, and that the proper figure should have been $68 more. It was on the strength of that testimony that the trial court awarded Beck the additional commission of $68—$35 payable at once and $33 payable whenever Brent shall pay his obligation to plaintiff in full.

Plaintiff justly complains of this. The subdealer's contract, which defined Beck's rights as a subdealer, provided for these specific commission agreements and that they should not be binding on plaintiff until approved by it at its home office. In each instance he received a copy of these agreements from the home office. Beck's testimony touching the discrepancy between the commission agreements in respect to the Adrian and Friesen sales and the amounts claimed by him was to the same effect. It reads:

"Q. You made no complaint about the commission on it? A. I never noticed the commission until I didn't get the commission—I didn't get the commission certificate.

"Q. How about the J. H. Friesen; is that the same situation? A. Same proposition; I supposed that contract all filled out—these commission agreements all filled out according to contract; I never dreamed they wasn't."

It is therefore perfectly clear that plaintiff never agreed to pay Beck more than $244 on the sale to Brent, and it cannot be required to do so. Moreover, it is settled law everywhere that one who puts his name to a written agreement cannot escape the binding force of his signature on the mere excuse that he assumed the blank spaces would be filled out according to his intention, nor on the excuse that he did not read its contents. (*Roach v. Karr*, 18 Kan. 529; *Custer v. Oliver*, 93 Kan. 760, 145 Pac. 554; 13 C. J. 308, 277, 370; 2 C. J. 1232-1244; 6 R. C. L. 624, 625; Restatement, Contracts, § 442.)

Plaintiff advances another argument based upon mathematical computations touching the prices at which these sales were effected and the consequent commissions which were due thereon, to show that even if no error had inhered in permitting Beck to go behind

the written agreements prescribing his specific commissions, the total amounts due him on the three sales had been paid. However, we regard the legal point urged by plaintiff as conclusive that Beck was bound by the specific terms of the commission agreements.

Plaintiff also complains because the trial court allowed commissions to Beck on sales to certain other persons—Hutchinson, Montgomery and Hall. The record fails to show that sales to these persons were effected by Beck. According to the contract which the trial court held to govern Beck's rights to commissions, it was requisite for him to consummate the sales, obtain orders signed by the purchasers, investigate and supply the required data touching their property standing, to record the security on deferred payments, and perform all the other services prescribed in the contract, as we have summarized above. None of these services were performed by Beck. He did not even pretend that he had consummated the sales. Hutchinson was Beck's own brother-in-law. Beck testified:

"Q. You never did close him? A. Later on; our price wasn't right.

"Q. Later on what? A. Later on. Our figures was too high; we couldn't sell him."

Hutchinson himself testified:

"In the year 1928 I bought a Minneapolis combine and tractor from that same company. It was some time in June that I bought it. I don't know who solicited me to buy that machinery. . . . I don't believe Mr. Beck ever talked to me before I bought. . . . I finally bought a combine and tractor from the Minneapolis. I finally made the deal with Mr. Gray."

It should be observed that under the terms of the contract between plaintiff and its subdealers a vast amount of work was required of the latter to earn the generous commission of twenty per cent. The rule governing a real-estate dealer's right to the customary small commission when he finds a person willing and able to buy a tract of land and puts him in touch with an owner who desires to sell has no application to the present situation. It would be grossly unjust as well as a plain breach of the contract terms to apply it.

Neither was there any basis for the allowance of a commission to Beck for the sale of a combine to Montgomery. While Beck claimed to have made the sale, he did not pretend to perform the services prescribed by the contract to entitle him to a twenty per cent commission. On cross-examination, he testified:

"I didn't have any combine set up on my floor. I couldn't say that Mr.

Gray was there that day myself; Mr. Moltz was. I didn't have anything to do directly with writing up the order and commission agreement, etc., on the deal; I took Mr. Montgomery in there and introduced him to Mr. Moltz and the other parties that were around. Mr. Moltz said he would take care of having Mrs. Crawford write up the order; fix it up for him. I went off and left him. I never did get any copies of any of these papers. . . . I never made any sale to him; made later by Mr. Gray."

Montgomery testified:

"The first party that saw me or that I saw about buying one was Mr. Beck. . . . Mr. Beck took me up to the Minneapolis, up to their building. . . . He told Mr. Gray that I was a customer that wanted a combine. . . . I had already made up my mind to buy this machine when I came to town. Mr. Beck didn't solicit me to get it."

Touching the sale to Hall, on which the trial court allowed a commission, Beck testified:

"I solicited him to buy a combine in the year 1928. Mr. Gray and I both went up there one time and seen him several times after. . . . I know of his giving an order, I don't know just when."

Turning to appellee's brief to discover, if we may, some justification for the items of commission allowed by the trial court, his counsel say that when Gray came to Dodge City in the early part of 1928, Beck furnished him with office room for six weeks or two months—which is no basis for any allowance in his behalf against plaintiff. It is also said that Gray agreed that he and Moltz would assist Beck in making sales; that Gray's stenographer would write the sales contracts; that Beck took customers to Gray's place of business and they worked together—all of which might have had some bearing on Beck's rights against Gray, or even against Gray's principal, under some oral contract; but on all the evidence the trial court was constrained to hold that Beck's rights were governed by the written contract. There is no cross appeal from that ruling; and it is a sheer waste of words to attempt to justify any claim to a commission outside its terms and outside the written commission agreements intended to and which did supplement it. A painstaking study of this record suggests the likelihood that Beck and Gray did have some private understanding whereby Beck was to be compensated whenever he was "the procuring cause of a sale"—to use the language of the real-estate dealers, but that was no concern of this plaintiff. It was entitled to recover its due from Beck, and it owed him nothing.

It follows that so much of the judgment as is predicated on de-

fendant's cross action should be set aside and the cause remanded with instructions to enter final judgment for plaintiff in the sum of $905.10 and for costs. It is so ordered.